Bruce HOWES, Plaintiff,

v.

The GREAT LAKES PRESS CORPORA-
TION and Holt Manufacturing
Company, Defendants.

No. 78 Civ. 2985 (LLS/JAR).

United States District Court,
S.D. New York.

Oct. 21, 1988.

Cohen, Milstein & Hausfeld, Jerry S. Cohen, Washington, D.C., and Kaplan, Kilsheimer & Foley, Robert N. Kaplan, New York City, for plaintiff.

Abelman, Frayne, Rezac & Schwab, Jeffrey A. Schwab, New York City, and Shlesinger, Arkwright & Garvey, George A. Arkwright, Arlington, Va., for defendants.

## OPINION

RESTANI, Judge: *

After two trials on the issue of patent infringement, neither of which resulted in a unanimous jury verdict, the court is presented with additional motions by defendants for an order defining the scope of plaintiffs' patent and for a directed verdict. Plaintiff opposes these motions and cross moves for judgment on the jury's "decision" or, in the alternative, that collateral estoppel be held to flow from certain interrogatories answered by the jury at the parties' request.

## BACKGROUND

This case involves a patent,[1] granted in 1976 for an offset printing process developed by plaintiff, Bruce Howes, and Thomas K. Holland, for printing multicolor patterns on fabric. This process involves combining several previously known processes and materials into a new use. In order to understand the Howes patent, some familiarity with the known processes and materials relied upon is required.

Heat transfer printing involves the printing of images onto an intermediary medium —heat transfer paper—utilizing special sublimation dye-inks. Once printed, the images appearing on this paper can be transferred to textiles through the application of direct pressure and heat. This causes the dyes to sublime onto the textiles, that is, to pass from their solid state on the paper, to a vapor state, and then back to a solid state. During this sublimation process, the

---

* Sitting in the United States District Court for the Southern District of New York by designation.

1. United States Patent No. 3,966,396. Hereinafter referred to as the Howes patent. The second trial in this matter occurred on May 23, 1988 and the transcript thereof is denoted "T." herein.

dyes tend to expand. It is such sublimation expansion for which the Howes patent seeks to compensate.

The Howes patent also relies upon the traditional planographic (plane surface) techniques of offset lithography. Offset printing requires the use of images that are broken down into patterns of clearly defined particles or dots, which are photoengraved onto printing plates and are used to carry ink through the press onto the print medium, in this case, heat transfer paper. As the size and concentration of these dots varies, so does the quantity of ink which is transferred to the heat transfer paper.

The production of dot patterns required for offset lithography usually involves a conversion process called halftone screening or halftone photography. Original art works, such as paintings and photographs, are typically made up of continuous tone images composed of differing densities or concentrations of material to yield tones that may blend throughout the artwork.[2] In order to print such art work, the continuous tone images must first be converted into dot patterns on "half tones" through a photographic process. This conversion involves photographing the art work while a screen containing a grid is placed on, or directly in front of, the photographic film.[3]

Additional steps are required to prepare multicolor art works for conversion to halftone images and printing. These steps enable the full range of colors appearing in art work to be reproduced using only three or four colors of ink, which are separately printed over each other.[4] In order to accomplish this, photographic color separations are made from an art work using color filters which only permit a limited range of the light spectrum to pass through to the film. In order to produce the proper color balance among the color separations, exposure and development times are individually regulated for each color. This is necessary because films do not respond the same to different colors of light. Whether a set of color separation negatives are balanced may be determined by measuring the densities of the continuous tones at selected areas of each color separation and comparing them to predetermined density aim points, which vary from color to color and by shadow, midtone and highlight regions. These balanced continuous tone color separations are then used to produce balanced halftone color separations, whose dot size and structure will ultimately determine how much ink of each color is to be transferred to the printed paper. The proper combination of the three or four colors of ink should result in the nearly accurate reproduction of all the colors present in the original art work.

Over the years, printers have found that certain additional corrections or compensations may be needed in order to achieve the desired tone color and detail. Corrections may be needed to compensate for various characteristics of inks, presses, and the papers on which the image is to be printed. This was typically accomplished by making adjustments affecting the presence or relative sizes of halftone dots by techniques such as etching and masking, which will be discussed further, *infra*.

## VALIDITY TRIAL AND REEXAMINATION

At earlier portions of this case, a jury returned a verdict in plaintiff's favor as to

---

2. Certain art work may be created without using continuous tone images. The benday or tint sheet process involves the creation of images by cutting out shapes from prepared shading or tinting patterns, which are then inked and laid over an image carrier.

3. Contact screening refers to screens which are placed in direct contact with the film, rather than at some distance in front of the film. Another method of screening involves special prescreened films which have a dot structure already present in the film emulsion.

4. The colors used in 3 color printing are magenta, yellow and cyan. Each of these colors theoretically should absorb one third of the color spectrum of visible light (in particular one of the three primary colors of red, yellow and blue) while allowing the remaining colors to be *reflected* to the viewer's eye. Black, which should absorb the entire spectrum of visible light, is added for 4 color printing.

the validity of the Howes patent. That verdict was set aside by the district court. On appeal to the Second Circuit, the court found that the Howes patent was patentable under 35 U.S.C. § 101 and "reverse[d] the order of the district court which determined as a matter of law that it was not." *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1024 (2d Cir.1982). After discussing the prior art and the Howes patent, the court found the following:

> Patents are not granted for the natural properties inherent in things existing in a nature, although they may be granted for things an inventor does with those properties. An old material cannot be patentable even though someone has discovered a hitherto unknown use for it, because the material was known. A new use for an old material does not make the *material* patentable. But the new use or application of an old material may be patentable. Similarly, a process or method which involves only a new use of an old material is patentable. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 16–17 (1954). In our view appellant's process falls within this last description.
>
> The statutory definition of process is broad. Howes' process falls well within its language since it is "a new use of a known process, machine ... composition of matter, or material." 35 U.S.C. § 100(b) (1976). Relying on a lithographic camera, aim points, an offset lithographic printing process, heat transfer paper and the expansion characteristics of dye-inks, Howes and Holland put together a new process, a hitherto unthought of combination of steps, for producing exact color facsimiles of art work on textiles.

*Howes*, 679 F.2d at 1029 (footnote omitted).

After the Second Circuit's ruling, but prior to a trial on the issue of infringement, a reexamination of the Howes patent was undertaken by the Patent & Trademark Office (PTO). In granting the request for re-examination, the PTO noted that the Second Circuits' opinion

> indicates that prior to the invention of the Howes et al. patent, gravure printing

(not lithographic offset printing) was the method used to print transfer sheets for use in heat transfer printing of textiles. However, the Court's decision does not indicate whether the court was aware that prior to December 18, 1974 (the filing date of the Howes et al. patent) lithographic techniques had also been used to some extent to prepare transfer sheets for this purpose.

Decision of PTO granting re-examination (December 6, 1985).

### Scope of the Howes Patent

Claim 12, upon which plaintiff has relied exclusively in the infringement portion of this case, now reads as follows:

> A method of textile printing suitable for producing a design formation on a fabric comprising the steps of photoengraving printing plates using an ink dot pattern produced from color compensated halftone positives and having a dot structure reduced in size in proportion to the ink transfer expansion and sublimation characteristics, applying controlled quantities of ink on the printing plates and dot pattern, transposing the inked dot pattern from the printing plates onto a support medium and then heat transferring the dye from the inked dot pattern in a vapor phase from the support medium onto the fabric whereby the ink dye from the ink dots expand to form a continuous tone pattern.

Claim 12.

The parties have been unable to agree upon the scope of claim 12 and what limitations are provided for by the phrase "ink dot pattern produced from color compensated halftone positives and having a dot structure reduced in size in proportion to ink transfer expansion and sublimation characteristics." Although some of the limitations which defendants urge the court to recognize in claim 12 are based upon interpretations of the language expressly contained in claim 12, other limitations are based upon equitable arguments relating to positions taken by plaintiff during the validity stage of this action and before the PTO re-examination.

█ The infringement stage of patent litigation involves two primary determinations: the scope of the claim at issue and whether the properly interpreted claim encompasses the accused method. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.1988). The proper meaning of a claim must be learned from a study of all relevant patent documents, *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1114 (Fed.Cir.1983) (citing *Autogiro Company of America v. United States*, 384 F.2d 391, 398–99, 181 Ct.Cl. 55 (1967)), including the other claims of the patent, its specification, its prosecution history *Uniroyal*, 837 F.2d at 1056, (citing *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569–70 (Fed.Cir.1983) and *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1985)), as well as testimony by expert witnesses as evidence of the construction of claims as they would be construed by those skilled in the art. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 675 (Fed.Cir.1984) (citing *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1571, 219 USPQ 1137 (Fed.Cir.1983).

█ In considering the question of whether a properly interpreted claim encompasses an accused method the courts have looked beyond the question of whether the claim is literally infringed, to the question of whether it is infringed under the doctrine of equivalents, including "reverse equivalents." The doctrine of equivalents may be used to expand or restrict the reach of a claim, by allowing a further inquiry into whether the accused method performs substantially the same function in substantially the same way to achieve the same result. *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (quoting, *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)). As the Federal Circuit has explained, "a finding of literal infringement is not the end of an infringement inquiry, despite numerous judicial statements to the contrary." *Mead Digital Systems, Inc. v. A.B. Dick Co.*, 723 F.2d 455, 463 (Fed.Cir.1983) (cross-referencing to a statement made by the Supreme Court in *Graver*, among others). *See*

*Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 933–34 (Fed.Cir.1987).

█ In patent matters, the courts have often expressed the concern that "[c]laims may not be construed one way in order to obtain their allowance and in a contrary way against infringers." *Tandon Corp. v. U.S. International Trade Commission*, 831 F.2d 1017, 1021 (Fed.Cir.1987) (citing *Autogiro Company of America v. United States*, 384 F.2d 391, 398–99, 181 Ct.Cl. 55 (1967)). This concern has often been given force through the application of "file wrapper" or prosecution history estoppel which acts to preclude a patentee from resurrecting claims given up to obtain the patent and overcome rejections. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362–63 (Fed.Cir.1983). Generally the concept of prosecution history estoppel arises in the context of determining the range of equivalents to the literal claims. The court is inclined to view the totality of plaintiff's statements, including those that might give rise to an estoppel, in the context of the proper construction of claim 12. If consideration of such arguments during the court's initial construction of claims inquiry is declared to be improperly premature or otherwise inappropriate, the court also views these arguments as applying with equal force as rulings regarding the scope of equivalents reached by claim 12. The court will now discuss each of the limitations asserted by defendants applicable to claim 12, either literally, or by estoppel.

### Proportional Dot Reductions

The parties dispute the meaning, application, and relevance of the following reference to proportional dot reductions appearing in claim 12: "ink dot pattern produced from color compensated halftone positives and having a dot structure reduced in size *in proportion to* ink transfer expansion and sublimation characteristics." (emphasis added). At the last trial, the court charged the jury on this issue, asking it to determine whether compensation made by defendant "was in proportion to the sublimation inks' expansion and sublimation characteristics, as the term 'in proportion'

is used in the Howes patent." Court's Exhibit No. 2 at 2–8.

Defendants argue that the court should rule, as a matter of law, that the disputed term has the particular meaning which they glean from the specification: that in compensating for any particular ink, the same degree of adjustment must be used throughout the shadow, midtone and highlight regions to be covered by that ink. Plaintiff responds that defendants' reading of the term "in proportion to" is improperly based upon an example in the specification, which may reflect the specific characteristics of the particular inks examined by the patentees, rather than the manner in which the patentees' used the term throughout their patent. Plaintiff asserts that the ordinary meaning of the term, which is the meaning to be used absent an indication that the inventor used it in a different fashion, *see Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir.1984), does not require that dot reductions be made uniformly across shadow, midtone and highlight regions, but merely that "the dot size should be reduced in relation to the degree by which the dyes expand." Plaintiff's Brief at 28.

The term "in proportion to" does not have a completely clear common meaning. Leaving aside the issue of uniformity, proportionality could be construed to require that reductions be made either for the entire magnitude of expansion, or only for some particular portion of such expansion.

Under *plaintiff's* definition of proportionality, reductions "in relation to the degree by which the dyes expand" would require that reduction in different shadow, midtone and highlight regions be made in relation to the approximately full degree by

which the dyes expand in those regions. As stated at page 39 of plaintiff's brief, "to the extent the dots expand and sublime, the dot structure must be reduced accordingly." Thus, under plaintiff's definition compensating reduction for substantially all dye expansion must be made.[5]

Despite these statements plaintiff argues that the patent should not be read to contain a specific requirement of proportionality. Plaintiff asserts that the references to proportionality in the PTO examiner's final statement of reasons for patentability provide support for its position: "His use of the words 'in direct proportion' in that Opinion, in conjunction with dot size reduction, makes it clear again that proportionality is subsumed in the basic thrust of the patent—that which distinguishes it from prior art—namely significant dot size reduction from conventional printing." Plaintiff's Brief at 29. *See id.* at 39 ("In any process in which compensation has been made by reducing dot size to the degree that the heat transfer [dye-ink] expanded or sublimed, then compensation has been made 'in proportion to' in the ordinary meaning of that term. These requirements have, in fact and law, merged."). Plaintiff even asserts that "Indeed, nowhere in any of the materials prepared by the Examiner is there the slightest suggestion that the patent teaches anything other than a significant reduction from industry standard for conventional printing." *Id.* at 30–31.

The examiner's final statement on patentability does not indicate that any part of the Howes patent is somehow subsumed into the results which it achieves. The examiner treated proportionality as an important aspect of the Howes patent.[6] His

---

5. By this statement plaintiff seems to have resolved the question of "proportion" in a way that limits its argument. The patent examiner's statements referring to "direct proportion" also connote a one-to-one adjustment as described in the specification. *See, infra,* note 7.

6. The examiner began his statement of reasons for patentability by referencing to the exemplary portion of the specification upon which defendants base their interpretation of proportionality as requiring uniformity across shadow, midtone and highlight regions. *See* Column 4,

lines 17–69 of the Patent, as cited in the Attachment to Reexamination Paper 20, at 1–2. Building upon this understanding, he then provided the following reasoning underlying his finding of patentability.

Requestor admits that the prior "art does not show large scale densitometer changes ... nor large magnitude reduction ..." of dot size "*in direct proportion* to the expansion of the dots on the textile". Clearly, the Howes et al process required and, even with today's dyes, requires dot size reductions significantly larger for at least one of the dyes than would have

conclusion explicitly recognized the novel character of both the magnitude and proportionality of dot reductions under Howes:

> Since the Howes et al. process requires dot size reductions significantly larger than those used in conventional lithography and since the prior art did not recognize that the dot size reduction should be in substantially direct proportion to each dye's expansion as taught by Howes et al., the claimed subject matter, as amended, as a whole, would not have been *prima facie* obvious to one of ordinary skill in the heat transfer paper printing art as of December 18, 1974.

Attachment to Paper No. 20 at 2.

■ As the portion of the specification specifically relied upon by the examiner indicated that the degree of sublimation expansion appears to vary from color to color (or dye to dye), but not among shadow, midtone, and highlight regions within a color, there was little reason for the examiner specifically to relate proportionality to different regions within each color or dye. Furthermore, the mere fact that the examiner may not have relied on certain limitations in finding the patent non-obvious, does not mean that the patent owner is thereby granted a broadening of the patent beyond such limitations. As the examiner explained, his amendment of claims 1 and 12 of the Howes patent "is not a broadening of the claims," and "the claimed subject matter, as amended, *as a whole*, would not have been *prima facia* obvious." Attachment to Paper No. 20 (Statement of Reasons for Patent Ability) (emphasis added).

As to a requirement of uniformity, there was no evidence produced at trial indicating that dyes in shadow, midtone and highlight areas expand differently within the same color. In fact plaintiff's dye expert said that it is the molecule size of the colorant that accounts for sublimation at

different dwell times. Thus, adjustment for sublimation seems to relate to color not lighter and darker areas of the same color. *See also* T. 463 and T. 448–49. The witness also observed that the colorants had not changed much from the time of the invention to the present. T. 452. Thus, one might conclude that someone using the Howes process would make adjustments very close to those of the Howes example, including adjustments of equal degree across all areas from highlight to shadow. If proportional dot adjustment may be substantially non-uniform it certainly was not demonstrated. Nonetheless, the court did not redefine proportionality in terms of uniformity and will not do so now, because there was nothing in the record which indisputably demonstrates that dyes do expand uniformly. This issue has not been flushed out sufficiently for the court to define proportionality in terms of uniformity, as a matter of law, but certainly a jury could find uniformity a key aspect of the proportional adjustment described in the patent.

As noted earlier, plaintiff stated that "[i]n any process in which compensation has been made by reducing dot size to the degree that the heat transfer [dye-inks] expanded or sublimed, then compensation has been made 'in proportion to' in the ordinary meaning of that term." Plaintiff's Brief at 39. Plaintiff apparently believes it has proved its case as a matter of law because of an assumption that a successful product will not be produced unless dot reduction compensates for substantially all expansion. There was no evidence to that effect produced at trial.

■ The court concludes that at the very least the term "in proportion" as contained in the patent means more than *some* adjustment is made for dye expansion.[7] It

---

been obvious to one of ordinary skill in the art in December of 1974. Since the Howes et al. patent teaches that the *dot size reduction should be in substantially direct proportion* to the expansion of the dye (e.g., 50% reduction when the expansion is 100%), the present claims do not cover subject matter even close to the maximum 15 to 20% adjustment used in the alleged prior art. In addition, none of

the prior art of record recognized that the dot size reduction should be in *substantially direct proportion* to the expansion of the dye as taught by the Howes et al. patent. (Emphasis added.)

7. The jury reached the conclusion that an adjustment for dye expansion was made. The jury did not conclude that reductions were made "to

means that an adjustment is made that bears a specific relationship to the *degree* of expansion. That relationship must be proved.

### Degree of Dot Reduction Required under Howes Patent

Both parties have made motions based on the *amount* of dot reduction supposedly required by the Howes patent. Plaintiff asks for directed verdict because the jury found reductions significantly larger than those involved in conventional lithography.[8] On the other hand, defendant asks this court to find that the Howes process requires, at a minimum, a 20% reduction in dot size, measured in absolute terms.[9]

As a preliminary matter, up until the final portions of the first infringement trial, the distinction between relative and absolute reductions was rarely, if ever, articulated. Accordingly, it is difficult to go back to earlier references to specific reductions upon which defendants would like the court to rely, and determine whether they were made in absolute or relative terms. The court instructed plaintiff prior to the second trial that he would be allowed to put on evidence of reductions in either absolute

or relative terms, but that he must present such testimony in such a way that the jury would be able to make appropriate comparisons. Plaintiff, for the most part, heeded this instruction during the second trial.

It is apparent that the PTO examiner had considered limiting the Howes patent to magnitudes of reductions that exceed those conventionally made in lithography. At plaintiff's urging, however, it did not do so. As discussed *infra*, plaintiff sought to avoid any such limitation regarding the magnitude of reductions, by stressing other limitations which it believed were sufficient to render the Howes patent non-obvious. Plaintiff did not concede any limitations with regard to the magnitude of dot size. The examiner did not amend the patent to include either a general or specific limitation regarding magnitude of reductions.

As defendant notes, the examiner did comment that, even with current heat transfer dye-inks, the amount of expansion during the sublimation process would require reductions larger than those that would have been obvious to one of ordinary skill in the art at the time the patent was granted.[10] These comments, however, ap-

---

the degree" to which the dye-inks expanded. Nor did it reach any other conclusion with respect to proportionality.

**8.** Plaintiff alternatively moves for an order that defendants are estopped from disputing any fact established by the jury's "unanimous decision." Plaintiff's brief at 41. Even if the court had ordered retrial, plaintiff's claim of collateral estoppel would be denied. No verdict or judgment, partial or otherwise, was entered in the record which could result in issue preclusion. With the consent of the parties the court sought the jury's "verdict" with regard to the one subinterrogatory on which it indicated it had reached decision. The purpose of this procedure was to assist the parties in preparing for future proceedings or for settlement.

This type of subinterrogatory which was answered was inserted with the agreement of the parties and relates to plaintiff's method of proof, as explained *infra*. Only in connection with a "yes" answer to the interrogatory on proportionality does it have meaning of significance to resolution of this action. In connection with no resolution of the proportionality issue it indicates a true inability of the jury to reach agreement on this case. Not only is it legally inappropriate to make any ruling on

collateral estoppel at this juncture, it would be grossly unfair given the jury's lack of consensus on the key issues.

**9.** The parties dispute whether the various references to percentage reductions throughout the prosecution history and the course of this litigation are stated in absolute or relative terms. In the printing trade, generally dot sizes or values are measured in terms of percentages. Defendants state that in the printing trade, differences in dot sizes are stated in absolute terms which refers simply to the subtraction of two numbers (i.e. the difference between a 60% dot and a 30% dot = 30%) Measured in relative terms, reductions refer to the percentage change between those two numbers (i.e. 60% dot reduced by 30% dot = 30/60 = 50%).

**10.** The patent owners described standard techniques for adjusting dot size to a degree which they believed was inadequate for heat transfer work as follows: "For example, conventional color corrections applied dot etching, masking, and contacting. Those procedures were not suitable for dot reductions of the magnitude required for sublimation inks." Patent Owner's Statement Under 37 CFR § 1.530 at 1–2.

pear to be based upon the state of heat transfer dye-inks at the time of the patent and the re-examination, not upon the possible future state of dye-inks, with which the patent owner had been concerned. The examiner apparently was convinced that the process was not obvious because of other limitations mentioned by the owner and did not add a magnitude limitation. The court will not add a magnitude limitation which the examiner did not add.

As to plaintiff's motion, that the examiner made various statements regarding the magnitudes of reductions shown in prior art does not address the issue posed in this case, that is, whether defendants' processes employ the patented method. The interrogatory put to the jury with regard to the magnitude of dot reduction relates to the approach plaintiff took to proof of infringement. Specifically, plaintiff sought to prove that defendants made dot reductions to compensate for expansion of dye-inks during the sublimation process by showing that defendants made reductions significantly greater than those made in conventional lithography.[11] Plaintiff's witness attempted to demonstrate this by measuring defendants' end results and by offering general statements on estimates of industry experience of non-heat transfer dot gain for comparison purposes. This type of evidence could support a finding that some reductions were being made for sublimination expansion. It also might support, together with other evidence, a finding that techniques such as chemical etching did not accomplish the entire reduction for dye expansion. The jury's answer with regard to magnitude of reduction, however, addresses neither questions as to proportionality nor questions as to the stage at which the reduction occurs. Thus, the motions of both plaintiff and defendants with regard to magnitude of dot reduction are denied.

### Color Compensation Methods Covered by the Howes Patent

The parties disagree as to which methods for creating "color compensated halftone positives" are, and are not, included within claim 12 of the Howes patent. Plaintiff provides the following background and interpretation of this term:

> In regard to the meaning of the key terms, the phrase "color compensated halftone positives" [or negatives] simply is another way of stating that the bottom line prior to the photoengraving process is that there be screened (halftone) positives or negatives. Screening puts the actual dots on the negative and positive film as opposed to a continuous tone positive or negative in which the color compensation is express in densities rather than dots. In other words, in preparing continuous tone positives or negatives, variations in density occur which are then converted to dots in the screening process to arrive at a screened (or halftone) positive or negative.

> .  .  .  .  .

> The term "color compensated" itself means that the ( ...) dot sizes have been compensated through reduction to account for the sublimation and expansion characteristics of the ink/dyes used in ink transfer printing. Under the terms of the patent, this color compensation should be in proportion to the sublimation and expansion characteristics of the heat transfer/dye inks utilized.

Plaintiff's Response to Certain Questions Raised by the Court, at 5–6.

Defendants argue that the color compensation step covered by claim 12 should not be read to cover all color compensated halftone screens, regardless of methods used to produce that color compensation and dot structure reduction. In support of their position, defendants look to various extrinsic sources including the other claims of the patent, the patent's specification, the prosecution history before the PTO, including the reexamination history, and the litigation history before the courts during the validity portion of this case. Defendants assert, generally, that "Until infringement

---

**11.** One of the examiner's reasons for finding the method not obvious and plaintiff's method of proof of infringement overlap.

became the issue, there was little question that the novelty of the Howes process was predicated upon an initial *photographic in camera* step which dramatically reduced the film emulsion densities on continuous tone color separation negatives." Defendants' Brief at 4 (footnote omitted).

Although the patent specification cannot be used to provide additional limitations not present in a claim, it may shed light upon the terms of the patent and its claims. The specification defines the concept of "out-of-balance" and "corrected" color separations produced by the introduction of a density compensation factor at the initial continuous tone color separation stage. Specifically, it states that

The printing procedure of this invention involves photographically reducing an original pattern into four separate color negatives and encompasses the application of a density compensation factor to produce out-of-balance color separations. These separate negatives are further projected through a halftone grid or screen to produce a dot pattern on a halftone positive, wherein the sizes of the dots correspond to the compensated film density at selected areas on the negative.

Column 2, at lines 15–24. After describing the conventional photographic methods for producing "balanced" color separations using industry standard density aim points, the specification goes on to explain that

The present invention, in contrast to conventional methods, uses a corrected or out-of-balance color separation 12. This is an important and necessary feature of this process ...

Column 4, at lines 18–21. This explanation is followed by a discussion of density compensation factors whereby specific density aim point values based upon certain sublimation expansion rates for different colors of heat transfer ink are used.

During the re-examination of the Howes patent, plaintiff filed a patent owner's statement setting forth the reasons why the claimed matter is not rendered obvious by prior art. *See* 37 CFR § 1.530(c).

Plaintiff provided the following summary of the patented process:

Previous heat transfer methods used for offset lithographic printing, produced images that were "muddy", lack purity and richness, and did not produce a sharp and clear image. This was do (sic) in part, because standard printing techniques were not capable of providing adequate color compensation for sublimation inks. For example, the conventional color corrections applied dot etching, masking, and contacting. Those procedures were not suitable for dot reductions of the magnitude required for sublimation inks. *The patentees adapted a photographic, in camera approach and devised a new standard for determining film emulsion densities at highlight, midtone, and shadow areas which served as new "aim point" for the cameraman.* This was used in conjunction with a revised "gray scale".

Color separation negatives were prepared having selected areas with different *film emulsion densities* for providing reduced light intensity transmission, thus resulting in "out-of-balance" separation negatives. The color separation negatives were then projected through a grid or halftone screen to produce an out-of-balance positive comprised of dot patterns wherein the dot structure was reduced in size corresponding to the intensity of light transmission through the film emulsion to form respective halftone positives having dot structures reduced in size and proportion to the respective ink transfer sublimation characteristics.

Patent Owner's Statement Under 37 CFR § 1.530, at 1–2 (emphasis added). Throughout the validity trial and appeal similar statements were made through testimony and briefing.

The court finds the above cited statements instructive in interpreting the scope of claim 12. They indicate that the required color compensation aspect of the Howes patent, generally, and the "color compensated" step in claim 12, specifically, are part of the basic teaching of the Howes patent. The Howes patent is not merely

concerned with the resulting "halftone positives having a dot structure reduced in size in proportion to the ink transfer expansion and sublimation characteristics," but rather is specifically concerned with the methods for achieving that result. Even if such methods may not be read into claim 12 in the initial step of determining a proper interpretation of that claim, they may be considered in determining whether claim 12 is to be applied to a wider or narrower range of equivalents than those processes to which its literal terms might imply.

Statements in the PTO history stress the importance of the making of photographic adjustments to film densities at the color separation stage in order to achieve the requisite color compensated halftones. These were made after the PTO examiner rejected the two independent claims (1 and 12) of the patent,[12] and after the examiner had proposed specific amendments to the patent intended to save the patent by limiting it to instances where the magnitude of dot reduction exceeded conventional magnitudes of dot reduction practiced in the industry.[13] The patent owner responded as follows to the PTO examiner's rejection and suggested amendment:

12. The PTO examiner explained the reasons for rejecting claims 1–6, 8, and 11–16 as follows:
> ... it is old to use lithographic printing techniques in preparing transfer papers used for heat transfer printing of textiles.... a four color printing process is a conventional lithographic practice.... it is conventional to make adjus[ ]tments in printing processes to compensate for various different ink characteristics. The patent owners apparently do not contest that the techniques used in the instant claims have been used in prior lithographic printing processes but only for relatively minor corrections usually amounting to a dot reduction of no more than 20%. The patentees point out that the claimed process has distinct advantages over the prior art in that it can be used with unmatched combinations of inks and inks requiring a dot correction of much more than 20%. The Examples disclosed in the patent specification all require a dot reduction of at least 50%. It is believed that the limitations in the patent claim 7 impliedly require a dot reduction to at least this extent. If the claims were limited to the situation wherein the ink dyes used were unmatched and required a reduction in dot size of at least 50%, it is believed that such

The patentee believes that the introduction of the suggested terminology may present unnecessary limitations on claim interpretation.

Specifically, the patentee does not wish to preclude within the scope of his claims coverage, the possible application of his process to sublimation dyes, which have been or may be developed, having different expansion characteristics than those dyes available at the time of this invention.

After reviewing the art of record and each of the independent claims 1 and 12, it is earnestly believed that the process defined by these claims is not obvious under 35 U.S.C. § 103.

It is respectfully submitted that prior art does not show the essential aspects of patentees' process, namely:—

1. Color correction for producing an out-of-balance vis-a-vis a balance negative,

2. Dot reduction with respect to sublimation dyes in comparison to dot reduction with conventional printing inks, and

3. *Photographic "in camera" color compensation* in contrast to masking,

> subject matter would be unobvious since those of ordinary skill in the art did not normally consider extending this approach to color correction beyond a dot reduction of *more than 20%. The general approach in the art when dot reductions of 20% were not successful was to try to find more evenly matched dye sets.* The present claims are drafted in language broad enough to cover the situation where the set of dyes used is very evenly matched and wherein a dot reduction of more than 20% would not be required in order to obtain satisfactory results. Where claims are broad enough to read on obvious subject matter as well as unobvious subject matter, the claims as a whole must be considered obvious. See *In re Lintner,* [458 F.2d 1013,] 173 U.S.P.Q. 560.
> Re-examination Paper 17, at 3–4.

13. The examiner's subsequent interview summary indicates that "The Examiner suggested adding the word—substantially—before 'reduced' in claims 1 & 12 accompanied by an explanation defining this as requiring a dot size reduction of at least 25% (or equivalent density reduction) for at least one of the (dyes) colors." Examiner Interview Summary Record, Paper 18.

etching or removal of impurities in printing inks.

.    .    .    .    .

*... Color compensation by reducing densities from standard balanced negatives* to obtain reduced half-tone patterns in proportion to respective ink transfer sublimation characteristics, however, have not been shown in the art of record. This was conceded by the requestor (see page 7, paragraph 3 and page 11, paragraph 1 of the Request).

An issue now raised by the Examiner is whether reference to the magnitude of dot size reduction must be included in the process steps. In regard to dot reduction, a percentage qualification or similar terminology is not essential for the reason that the prior art does not discuss a combination of steps for *photographically achieving compensated half-tone positives* using sublimation dyes to produce an out-of-balance separation for heat transfer purposes.

.    .    .    .    .

Even if dot reduction was known as used with printing inks, the patentees provided a method for achieving color compensation for sublimation dyes using selected *film emulsion densities.* The transfer of printing ink is "mechanical" in nature, whereas the sublimation process is a "chemical" reaction which takes place under specified conditions of heat and pressure. Thus, the combination of steps clearly provided a patentable process.

When considering the *cumulative* differences of the process of this invention in view of the above remarks, it should now be apparent that the claims as allowed were valid and that a Reexamination certificate should now be issued.

Patent Owner's Response, Paper 19 at 2–4 (emphasis added).

■ The court finds that these additional statements, in addition to fully explaining

the literal claim, rise to the level of estoppel.[14] That is, if the limitation to a certain type of compensation is not present in the claim 12 language these statements provide such limitations. They were made in response to a specific rejection of the two independent claims of the patent (claims 1 and 12), in an effort to overcome such rejection as well as to avoid the PTO examiner's proposed amendments limiting the Howes patent to certain magnitudes of dot reductions. The PTO examiner had noted in his rejection that "The patent owners apparently do not contest that the techniques used in the instant claims have been used in prior lithographic printing processes, but only for relatively minor corrections usually amounting to a dot reduction of no more than 20%." *See* Attachment to Re-examination Paper No. 17 at 3. In response, the patent owner sought to show, among other things, that the techniques used in the instant claims—utilizing photographic "in camera" alterations of film emulsion densities in order to compensate for the eventual expansion of dye-inks during the sublimation process—were patentable and nonobvious without express limitations regarding the magnitude of reductions obtained. Thus, the patent owner sought to avoid limiting the patent to situations where it would involve magnitudes of reductions greater than those practiced under conventional lithography by arguing the novelty of initial photographic "in camera" adjustments of film emulsion densities to compensate for expansion of dye-inks that does not occur until the final sublimation process.[15]

Apparently, the PTO examiner was persuaded by the patent owners' arguments. The patent was amended without any explicit reference to the degree or magnitude of reductions covered by the claims. Instead, the words "expansion and" were added prior to the word "sublimation" in claims 1 and 12. The examiner provided the following reasons for this action.

14. As to the matter of claim interpretation, the court sees no jury issue. The PTO history leaves no ambiguity as to the method of compensation to which claim 12 refers.

15. Throughout the trial this method of compensation has been referred to succinctly as compensation at the continuous tone separation stage.

The addition of the words "expansion and" to independent claims 1 and 12 is not a broadening of the claims, but merely clarifies that the expansion factor is the most important of the "sublimation characteristics" originally recited in the claims in determining the degree of dot size reduction. This is clear from the discussion at column 4, lines 17–69 of the U.S. patent 3,966,369.

Attachment to Paper No. 20, at 1.[16]

■ Assuming that ordinary principles of prosecution history estoppel do not apply, plaintiff argues that the court may not read limitations contained in claims 1 and 13 into claim 12. Under the doctrine of claim differentiation, where some claims are broad and others are narrow, the narrow limitations cannot be read into the broad claims either to avoid invalidity or escape infringement. *E.g. Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054–55 (Fed.Cir.1988). Defendants concede that, as a general proposition, the limitations found in narrower claims cannot be read into broader claims to avoid invalidity or escape infringement.[17] They argue, however, that "the Federal Circuit has held that if the only means of sustaining validity is to read limitations into claims, then that is what must be done." Defendants' Brief at 30.

■ The Federal Circuit has stated that "Whether or not claims differ from each other, one cannot interpret a claim to be broader than what is contained in the specification and claims as filed." *Tandon Corp. v. U.S. Int'l Trade Commission*, 831 F.2d 1017, 1024 (Fed.Cir.1987) (citing *Autogiro Co. of America v. United States*, 384 F.2d 391, 397, 181 Ct.Cl. 55 (1967)). In *Tandon*, the court upheld a finding that an accused device performed the same func-

16. The referenced section of the patent contains the portion of the specification, which plaintiff downplays as merely exemplary and based upon the particular characteristics of the dye-inks used by the inventors. That section begins by distinguishing the Howes patent with the previously quoted language—"The present invention, in contrast to the conventional methods, uses a corrected or out-of-balance color separation 12. This is an important and necessary feature of this process ..." After describing the rapid expansion which is inherent in the sublimation process, the statement goes on to explain that

Consequently, it has been determined that a compensation factor must be introduced into the printing process in anticipation of these conditions. The out-of-balance separation 12 provides for increased spacing between the dots as printed; this correction factor is tailored in accordance with the sublimation characteristics of each color dye. Accordingly, when preparing the corrected color separation 12, the standard densitometer readings have been reduced in proportion to the expansion or explosion factor of the particular dye or ink which is used, and consequently the film emulsion on the separation negatives produced in this process will automatically be adjusted to provide adequate spacing or dispersion between the dots or beads of ink.

Column 4, at lines 28–42. The portion of the specification cited by the PTO examiner goes on to state that:

By way of example, a schedule of the standard densitometer readings, as taken with a McBeth densitometer, for balanced color separation negatives is as follows:

| Color | Highlight | Midtone | Shadow |
| --- | --- | --- | --- |
| Yellow | 180 | 115 | 55 |
| Red | 180 | 120 | 60 |
| Blue | 180 | 100 | 40 |
| Black | 220 | 140 | 70 |

In accordance with the present invention, for optimum results the readings for yellow should be reduced by about 80%, since it has been found that the yellow dot will expand about five times its original size; correspondingly, the red readings should be reduced by about 67%, the blue by about 67%, and the black by about 50%.

A revised schedule of densitometer readings pursuant to the process of this invention is as follows:

| Color | Highlight | Midtone | Shadow |
| --- | --- | --- | --- |
| Yellow | 36 | 23 | 11 |
| Red | 60 | 40 | 20 |
| | | | 13 |
| Blue | 60 | 33 | ... |

Column 4, lines 28–69.

17. Although defendants state that they do not dispute this exact proposition, acknowledging the same *Uniroyal* decision as proper authority, they argue that the doctrine of claim differentiation "is not applicable where a limitation of one claim is argued to have been read into a separate independent claim." Defendants' Brief at 30. In *Uniroyal*, however, the Federal Circuit applied that doctrine where the limitations of claim 1 had been read into an independent claim 2, finding that the district court "erred as a matter of law in not applying this principle [of claim differentiation] when it interpreted claim 2." *Uniroyal*, 837 F.2d at 1055.

tion as the patented device, but in a different way. Although the manner in which that function was performed under the patent was not set forth in the claims at issue, it was set forth in other claims, and urged as a "significant feature" before the Patent Office. The court rejected plaintiff's argument that the doctrine of claim differentiation precluded the incorporation of this limitation into the claims at issue, explaining that

> As we observed *supra*, the doctrine of claim differentiation does not allow unrestrained expansion of claims beyond the description of the invention in the specification, and explanations and representations made to the PTO in order to obtain allowance of claims. *See Autogiro*, 384 F.2d at 399....

*Tandon*, 831 F.2d at 1028.[18] The court's analysis in *Tandon* appear to be directly applicable here. The court concludes that it cannot allow plaintiff at this late stage of the litigation to reject his own description of his inventions, the arguments made to sustain its validity and particularly the statements made to avoid a rejection by the PTO. Everything which occurred prior to the infringement trial leads to the conclusion that plaintiff cannot demonstrate infringement unless he can show that the adjustments in question were made by adjusting film densities to achieve non-standard continuous tone separations. Thus, any infringing method must accomplish the proportional compensation for dye expansion in the same way as is described in the Howes patent, that is, by compensation

through creation of out of balance continuous tone separations.

### Electronic Scanners

Defendants also argue that plaintiff is estopped from claiming infringement of the Howes patent, under the doctrine of equivalents, by any methods utilizing electronic scanners. First defendants note that plaintiff has stated that "[t]he patentees adopted a photographic, in camera approach...." Patent Owner's Statement Under 37 CFR § 1.530(c), Reexamination Paper No. 13, at 2. They then quote the following portions of the patent owner's initial statement regarding references relied upon by the requestor:

> The art cited by the requestor by his own admission, does not disclose a method for reducing of densities from standard balanced negatives to obtain reduced half-tone dot patterns in proportion to respective ink transfer sublimation characteristics (See page 7, paragraph 3 of request).

> · · · · ·

> The Crosfield et al patent describes an electronic scanning apparatus intended to perform photographic processes used by color separation craftsmen. This reference has no application to the Howes et al process notwithstanding the requestor's comments that this reference teaches that it would be apparent to one skilled in the art that color correction could be made in preparation of printing plates by using a scanner. The patentees did not use a scanner, further-

---

**18.** The relevant portion of the Federal Circuit's discussion in *Tandon* is set forth in its entirety. The case concerned double sided disk drives used in computers. The fact finder had found that although the accused drives provided a "positional reference," they did not do so in substantially the same way as the patented drives (i.e. by a sufficient penetration of the transducer into the plane of the disk). The terms "transducer" and "head" appear to be used interchangeably.

Tandon points out that only claims 2 and 13, not here at issue, expressly require penetration of the transducer into the plane of the disk. Invoking the doctrine of claim differentiation, Tandon argues that claims 1, 5, and 12 are not limited to devices that pen-

etrate the plane of the disk. However, before the Patent Office the applicants stated that penetration of the plane is what provides a "reference position" for the disk, and in response to the examiner's rejection of all claims the applicants emphasized "a significant feature" of the "fixed head which serves as a positional reference." As we observed *supra,* the doctrine of claim differentiation does not allow unrestrained expansion of claims beyond the description of the invention in the specification, and explanations and representations made to the PTO in order to obtain allowance of claims. *See Autogiro,* 384 F.2d at 399, 155 USPQ at 703–04.

*Tandon,* 831 F.2d at 1028.

more, the patentees were working in sublimation inks whereas this reference discusses standard printing inks having completely different characteristics. *Id.* at 6–7.

▬ The prosecution history does not indicate, however, that the Crosfield patent was of any consequence to anyone other than requestors.[19] Although the Crosfield patent was cited in the Requestors Statement at pages 20–21, it was not one of the references relied upon by the examiner in its decisions to grant the reexamination, to reject various claims, to amend and to find the patent non-obvious and patentable. In fact, it appears that the Crosfield patent was never cited by the examiner at any point.[20] Viewed in light of the above, the court does not consider the patent owners statements regarding the Crosfield patent to rise to the level of a prosecution history estoppel, although the statements bolster the court's conclusion about the scope of the patent as limited to a particular process involving reduction at the continuous tone stage. Whether or not plaintiff is able to show that methods utilizing electronic scanners are equivalent depends upon the showing it makes regarding continuous tone stage adjustments and the legal requirements for finding infringement under the doctrine of equivalents. *See Pennwalt Corp. v. Durand Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987). The court will address each of defendants' processes to assess whether plaintiff presented sufficient evidence that an adjustment in proportion to dot expansion was made at the continuous tone stage so as to allow a jury to find for plaintiff as to the relevant process.

### Infringement by Defendants' Specific Processes

#### Background

Defendants are two manufacturers and sellers of heat transfer paper for textile printing. Great Lakes Press Corporation uses a lithographic process camera and a scanner that reproduces black line drawings, which is used in conjunction with a "Scitex" coloring system.[21] Until 1983, Holt Manufacturing Company did not use a lithographic process camera in-house; it purchased separation negatives from Pictorial Engraving Company. From 1983 to 1984, in duplicating original artwork, Holt made its own separations. T. 698–99. Holt also uses scanners for duplicating original artwork, the one discussed at trial is known as a Dia–Nippon 888–II. Both Great Lakes and Holt also use a process known as hand tinting or stripping.

#### Hand Tinting or Stripping

#### (Holt and Great Lakes)

▬ Hand tinting involves physically cutting tints or screen with various dot values and laying them out to yield flat tone images on a negative, and in turn, plates, printed transfer paper, and printed fabric.[22] According to plaintiff's expert witness, the compensation factor in manual tinting occurs during the process of manually selecting specific tints or screens (rather than others) to yield the desired result.[23] The methods of hand tinting do

**19.** The requestor was represented by one of the counsel for defendants in this action. Several of the accused methods utilized by defendants incorporate electronic scanners.

**20.** As plaintiff notes, however, the examiner apparently considered the Crosfield patent; it was initialed by the examiner along with the other references cited by defendants. *See* Attachment to Paper No. 21 (PTO Form 1449).

**21.** There was a reference to use of Scitex equipment alone. Presumably this is the computer created artwork occasionally referred to by various witnesses. This process was not explained and thus cannot be the basis of a liability finding. If Great Lakes had a scanner which it uses

to duplicate original artwork other than black line drawings, the process was not explained.

**22.** This process is suited to duplicating cartoon-type artwork without full tonal ranges.

**23.** Specifically, when asked to define compensation in the tinting process, plaintiff's expert witness responded that

I believe when you walk up to a shelf containing a variety of tints with heat transfer in mind, you pick up a certain tint, you automatically compensated for the expansion that would come in the sublimation stage versus walking up to the same shelf reaching to another one and getting another value for commercial work.

not appear to differ depending upon whether the final result will be used for conventional lithographic printing or heat transfer printing. This is due to the fact that the initial selection of tint values in hand tinting may be based directly upon observations of samples containing the colors that each tint value will yield at the end of the printing process. *See* T. at 577–83. Although plaintiff's expert witness testified that he considered the tinting process to involve photographic stages, he did not testify that the compensation factor in hand tinting, as he understood compensation, was itself a photographic process. In any event, it is undisputed that manual tinting involves no continuous tone separation stage whatsoever. *See id.* at 385, 573–75.[24] Thus, it is impossible to find a proportional adjustment for sublimation expansion at the continuous tone stage. Production of heat transfer printing by the hand tinting process does not infringe.

### Scitex (Black Line Drawings at Great Lakes)

■ Defendant Great Lakes produces heat transfer paper utilizing a computer assisted design system known as a Scitex to assign tint or color values to black outline drawings that input into the system through an electronic scanner. Defendants characterize this use of the Scitex as the electronic equivalent of hand tinting or stripping. Plaintiff disputes that characterization, and specifically, asserts that the Scitex is a photographic system utilizing photographic techniques and compensated continuous tone separation negatives in electronic form, which are equivalent to the compensated continuous tone separation negatives in conventional cameras.

The selection of colors and screen values in this process, as in hand tinting, is based upon visual observations of color charts. As in manual tinting, the charts may re-flect the particular type of printing process and materials to be utilized. Whatever compensation is made for expansion of dot values during the sublimation process is already factored into these charts. The screen or tint values are taken directly from these charts, based upon visual observation and selection among the various colors appearing on that chart. T. 302. These are then input into the Scitex. *Id.* at 299 and 301. The Scitex outline filling process is the equivalent of hand-tinting. *See id.* at 391–92, 395. Despite testimony by plaintiff's expert, *id.* at 407–08, there is no step that reasonably may be called compensation for dye expansion at the continuous tone stage. As the witness later testified the only equivalent of a continuous tone stage is the black line. *Id.* at 618–19. It is not altered. As with hand-tinting, the jury could find only that the Scitex process does not produce the same result in the same manner as is described in the Howes patent. Accordingly, this use of the Scitex does not infringe.

### Photographic Separation (Holt and Great Lakes)

There are three different processes to be considered—Pictorial's (Holt's supplier), Holt's in house, and Great Lakes'. Defendants' witness testified he made only standard separations, with no adjustment specifically for heat transfer. T. 712. According to *plaintiff's* expert, Pictorial's continuous tone separations are *standard* or *close to standard, i.e.,* similar for both conventional and heat transfer lithography. T. 567. He also stated that reductions at the continuous tone stage only partially compensated for expansion and they were limited to masking. T. 372–73, 562–65. "Masking" has been described as a conventional technique that was also described by plaintiff, in seeking to overcome the patent examiner's objections, as being outside the patent.[25] Plaintiff has consistently disa-

---

T. 577. Subsequently, the witness clarified his opinion and indicated that compensation can occur during the selection of screens, specifically, by varying the number of dots per given area, rather than varying what is commonly referred to (throughout this opinion and the patent) as dot values or dot size. *Id.* at 581–85.

**24.** *See* also, *supra,* note 2.

**25.** For example, at page 2 of Paper 19, the Patent Owner's Response, it states that the process is not obvious because of several novelties including, "[p]hotographic 'in camera' color

vowed any claim related to masking.[26] In any case, a partial compensation of whatever nature at the continuous tone stage is not the proportional compensation referred to in the patent. From the testimony presented a jury could conclude only that plaintiff failed to demonstrate that the major expansion compensation contemplated by the Howes patent occurred at the continuous tone separation stage insofar as Pictorial's separations are concerned.

As to Holt's in-house camera work there was no specific testimony as to what was done. Holt apparently used a lithographic process camera from 1983–1984. No one from Holt testified as to how it was used. Plaintiff's witness never saw Holt's camera, or made any analysis of separations produced by the camera.

On recross examination beginning at T. 641 plaintiff's witness references continuous tone separations at Holt. The testimony is extremely confused and purportedly is based on other testimony, which the court did not find in this record. This was not clarified on redirect. The bottom line of the exchange seems to be that the witness believes that an across the board twenty percent reduction in absolute terms was made by this process. The testimony was that there was an in-camera correction. On redirect at T. 668 there is a question which asks for a conclusion about proportionality. The witness finally responds yes to the question on T. 669.[27] The question facing the court is whether from this a jury could reasonably conclude that an adjustment in proportion to dye expansion was made at the continuous tone stage of Holt's in-camera process. The witness testified as a fact witness and also offered expert opinion testimony. Factually there is simply

insufficient information about what was done to make the correction, even if the correction were proportional, for a jury to conclude that the method described in the Howes' process was followed. There also is no general testimony that the full proportional adjustment was made at the continuous tone stage.

As to specific descriptions of Great Lakes' photographic process plaintiffs produced only the testimony of a witness from Great Lakes. He stated that he used the same separations for both heat transfer and conventional work. T. 191–92, 201, 216. He also stated that he made a twenty percent reduction in the midtone areas at the screening stage, i.e., not the continuous tone stage. *Id.* at 202. Great Lakes' witness stated that sublimation adjustments were made at the screening stage by a "bump and flash" technique. T. 202. There is nothing in the record to suggest there is any dispute that at least some of the relevant adjustment was made at the screening stage.

Plaintiff's witness bases his general conclusions about Great Lakes' process largely on its color chart for heat transfer work and possibly a late stage example of what is produced by Great Lakes' camera method. The witness found significant differences from conventional lithography in the dot percentages coinciding with the color squares on the chart. From that and presumably his general expertise, the witness concluded that the adjustments were proportional, T. 374, and were made at the continuous tone stage. *Id.* at 323. Once again plaintiff's witness saw no camera operations, *id.* at 322. Based on the charts and his general knowledge, not observation

---

compensation in contrast to masking, etching or removal of impurities in printing inks."
The statement continues:
The Southworth article refers to color adjustments in process inks (not sublimation dyes), and is concerned primarily with obtaining balanced negatives. The methods suggested by Southworth includes correcting for impurities in the process inks, masking and etching. Color compensation by reducing densities from standard balanced negatives to obtain reduced half-tone patterns in proportion to respective ink transfer sublimation charac-

teristics, however, has not been shown in the art of record. . . .

**26.** Exactly how masking works was not described. If there is more than one type of "masking" that was not explained to the jury.

**27.** The witness also answers yes on T. 669 to the question as to whether the *degree* of compensation falls within the patent. This question is so vague in reference to terms of the patent as to be of no value to a fact finder.

and measurement of Great Lakes' press qualities, its dye-inks or its separations, he concluded that the correction is proportional and made at the continuous tone stage. Assuming *arguendo* that one may separate the concept of proportionality from the overall process and that a jury could conclude that the final reductions were demonstrated to be substantially proportional to dye expansion, even though actual dye expansion was not measured, one is still left with the question of whether a jury could conclude that the proportional adjustment was made at the continuous tone stage.

In order to accept the witness' general conclusion in plaintiff's favor on this issue the jury would be required to infer that the witness knows something he has not said, that is, that the "reductions" observed in the charts cannot be made during this process unless they are made almost entirely at the continuous tone stage.[28] A comparison of Pictorial's and Great Lakes' chart values does not reveal great overall differences.[29] As the court has noted, plaintiff's witness indicated that Pictorial's relevant adjustments are not made entirely at the continuous tone stage.

■ It also appears undisputed that both prior to the Howes patent and subsequent thereto some adjustments to dot size could be made at the screened (half tone) stage by chemically etching the dots. Etching-type reductions may also be made electronically, presumably with greater flexibility. One machine utilized by Holt, the sigmagraph, was described as performing electronic etching. T. 650. Pictorial uses a process called cross screening. *Id.* at 399, 566. Plaintiff's witness testified that "today" successful heat transfer may be obtained by making adjustments at the screened stage. T. 136–37.[30] In light of these statements and the previously noted

testimony of the witness, for the jury to accept plaintiff's witness general conclusion as to the stage at which the proportional correction is made, without specific factual testimony as to such adjustments, amounts to sheer speculation. In light of plaintiff's own statements about various processes, the jury cannot draw the inferences plaintiff seeks or accept the general conclusion on the basis of this record. Looking at the record as a whole, the court concludes that without some specific description of Great Lakes' process that is compatible with its theory of infringement plaintiff could not make out a *prima facie* case of infringement by such a process.

### Electronic Scanner Processes (Not Black Line/Holt)

■ The only scanner process described for duplicating original artwork other than black line drawings was Holt's Dia–Nippon scanner process. This process does not involve a conventional camera to reproduce the work and adjust dot size instead, according to plaintiff's witness, the scanner duplicates the steps of concern. Specifically, the witness testified that "[t]he operator is specifying compensation to be made from the original to the continuous-tone electronic version stored in memory." T. 518–19. *See also id.* at 522. The jury, however, is entrusted with the final equivalency decision. In order to make its decision the jury needed information as to whether Holt's scanner and Howes' camera process accomplished the same result in substantially the same way.[31] The witness would not speak about film densities and disavowed expertise as to them. Thus, he could not and did not give the jury the facts it needed to reach an equivalency determination. Had the witness not dis-

---

**28.** The witness said nothing about the "bump and flash" technique.

**29.** Compare the numbers at T. 320 (Great Lakes) and T. 539 (Pictorial). The numbers at T. 539 are slightly lower, but an additional downward adjustment for each color had been made after original compilation of the results according to the same methodology used with regard to Great Lakes.

**30.** The witness did not testify as to when this ability first existed.

**31.** The court instructed the jury on the proper standard. The standard was discussed in connection with the earlier trial. Thus, plaintiff was aware that he was required to produce sufficient factual data for the jury to consider on this point.

claimed knowledge of film processes, *see* T. 510, 520, the jury might be permitted to accept his general conclusion. Without expertise, the conclusion is simply an empty statement.

Plaintiff's main witness, who qualified as an expert in graphic arts with some knowledge of scanners, also testified that the digitally stored memory aspect of a scanner was equivalent to a continuous tone stage. T. 42, 56. The witness, however, disclaimed knowledge of electronic circuitry. T. 131. Neither witness gave a detailed description as to how the continuous tone out of balance separation aspect of the patent is accomplished through scanner electronics. The witnesses are not necessarily required to possess totally overlapping expertise. Had one described the camera process in detail and the other the electronic process, the jury might have been able to make a comparison, or some other method might have been used to compare the processes. But neither witness described film density changes or electronic functions in a detailed technical way so as to permit the jury to draw its own conclusion. The jury was presented no statements actually juxtaposing specific steps involving film emulsion densities with electronic circuitry operations. Thus, both witnesses failed to make the necessary factual statements and their general conclusions are not useful because one disavowed expertise in scanner electronics and the other disavowed expertise in film processes.[32]

For the sake of completeness the court believes it should examine the proportionality aspect of this process as well, as it is difficult to keep the concepts of proportional adjustments and the stage at which they are made entirely separate. As alluded to previously, plaintiff might have shown that the dot reductions made by defendants compensated for all dye expansion or was proportional to it in some lesser degree, by producing evidence on the expansion characteristics of the dye inks used by defendants, and on the dot expansion experienced by defendants during their particular lithographic printing. Plaintiff did not take this direct approach but, instead, relied upon evidence of the amount of total adjustments made by defendants (including adjustments for traditional press gain and other factors which cause the dots to increase prior to the sublimation process) and estimates of generally expected non-heat transfer dot gains to arrive at imputed figures for the amount of adjustments made by defendants for expansion during the sublimation process.

The calculations plaintiff's witness made for these particular processes are at T. 337–38. They are based on Exhibits 7 ABC which are the "values utilized" in the scanner. *Id.* at 328. The witness' general conclusion as to the range of reductions was that it was in the range of twenty to fifty percent in relative terms and that such reduction is in proportion to dye sublimation expansion. *Id.* at 338–39. The witness also arrived at the general conclusion that the adjustments made fall within the purview of the patent. T. 339. There are descriptions of Holt's scanner operations in the record. *See* T. 209–82. Exhibits 7 ABC are also in evidence.[33] Although plaintiff's witness did not measure dye expansion qualities, it may be concluded from the testimony of defendants' scanner operator that some across the board adjustment was made for sublimation expansion. Plaintiff's expert concluded that such an adjustment was proportional to sublimation expansion. Although the witness did not measure gain experienced from press factors, based on his general expertise he concluded that they were a minimal part of the adjustment.

---

**32.** Essentially after expertise is disavowed the opposing party is not in a position to cross examine the witness in any meaningful way as to the opinion stated.

**33.** There are not enough numbers in the testimony alone regarding the charts to determine if substantially the same relative reductions were made within a color. Exhibits 7 ABC, together with other testimony as to commercial standards, reveal the relative reduction varies approximately twenty percent within a color. It's doubtful whether the jury was given enough information to deduce this; but the court will assume they could do so.

There remains the question of what definition of proportion the witness employed. His answers on this were never very clear and at times were seriously overbroad. *See, e.g.,* T. 590–591. Nonetheless, in viewing the record as a whole, the court concludes that there is evidence that the witness had a proper standard in mind, although he accepted wide ranging results as satisfying the standard.

The more serious problem of proof which the court sees is the lack of a clear explanation of how the proportional adjustment is made in Holt's scanner operations in a manner sufficiently similar to the in-camera adjustment called for at the continuous tone stage, so that the process may be considered within the purview of the patent, including its legally acceptable equivalents. As indicated, the testimony was simply too vague to allow a jury to conclude that infringement by Holt's scanner process took place.

### Conclusion as to Liability

The court finds plaintiff failed to present proof that a proportional compensation was made for sublimation expansion at the continuous tone separation stage for any of defendants' processes. Plaintiff's view that any reduction in dot size which produces acceptable heat transfer work offends the patent is rejected. The patent describes a specific method for making reductions which are proportional to dye sublimation expansion characteristics and which involve major adjustments at the continuous tone stage to achieve out of balance separations. This was the patent found valid by the Second Circuit and later accepted by the PTO as not obvious, after prior art with regard to lithographic heat transfer processes was uncovered. Adjustments which bear no demonstrated proportional relationship to the degree of dye expansion and which are made at the screening stage are not within the method described by the patent.

### Attorneys' Fees

Defendant has moved for an award of attorneys' fees to discharge patent misuse. This case represents a genuine dispute over the scope of the patent. Plaintiff's proof failed largely because the thrust of his pre-trial discovery and investigation and the resulting evidence were directed to establishing large scale reductions in dot size and did not focus on the particular steps found by the court to be required by the patent. The patent is sufficiently difficult to construe that the court finds plaintiff to have proceeded in a non-frivolous manner in attempting to establish patent infringement. No misuse requiring payment of fees occurred.

Judgment is to be entered for defendants.